**UNITED STATES of America,**

v.

**Anthony CASSO, Defendant.**

**No. 90–CR–446 (S–4) (FB).**

United States District Court,
E.D. New York.

June 29, 1998.

Zachary W. Carter, United States Attorney, Eastern District of New York, by George A. Stamboulidis, Assistant United States Attorney, United States Attorney's Office, Garden City, NY, for the government.

Matthew J. Brief, Brief, Kesselman, Knapp & Schulman, LLP, New York. NY, for the defendant.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

Pending before the Court is a motion by defendant Anthony Casso ("Casso"), a former underboss and consigliere in the Luchese crime family, for specific performance of his 1994 cooperation agreement. The government contends that it is not obligated to file a motion for a reduced sentence pursuant to § 5K1.1 of the Sentencing Guidelines because, *inter alia*, Casso committed crimes during the term of the cooperation agreement.[1] Casso contends that the government is acting in bad faith in seeking to disavow its obligation to file the § 5K1.1 motion. Specifically, he asserts that his conduct did not constitute a material breach of the cooperation agreement, that the government's stated reasons for abrogating the cooperation agreement are a pretext, and that the government entered into the agreement with the intent to breach it at a later time. Casso also challenges the conditions of his confinement and his removal from the Witness Security Program ("Program"). For the reasons set forth below, the Court determines, *inter alia*, that Casso's commission of other crimes while in prison, while perhaps not a material breach of the cooperation agreement, nonetheless justifies the government's honest dissatisfaction with his performance. Accordingly, Casso is not entitled to specific performance. The Court also determines that Casso must exhaust his administrative remedies in respect to his removal from the Program.

## BACKGROUND

On March 1, 1994, Casso pleaded guilty before the Honorable Eugene H. Nickerson to 70 crimes, including racketeering and racketeering conspiracy in violation of 18 U.S.C. §§ 1962(c) and (d); murder, attempted murder, and conspiracy to murder in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(1) and (a)(5); and extortion in violation of 18 U.S.C. § 1951. During his plea allocution, Casso admitted to having

---

1. Section 5K1.1 of the Sentencing Guidelines provides, in pertinent part, that "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investiga-tion or prosecution of another person who has committed an offense, the court may depart from the [sentencing] guidelines."

conspired with other members and associates of the Luchese crime family to murder fifteen people. Certain of the charges to which Casso pleaded guilty carry a mandatory term of life imprisonment. In connection with his plea, Casso signed a cooperation agreement in which he pledged: (1) to be fully debriefed and to attend meetings concerning his participation in and knowledge of criminal activities; (2) to furnish to the Office of the United States Attorney for the Eastern District of New York ("Office") all documents and other materials relevant to the investigation that were in his possession, custody or control; (3) not to reveal his cooperation to any third party; (4) to testify at any proceeding in the Eastern District of New York, or elsewhere, as requested; and (5) to consent to adjournment of his sentencing. Casso also agreed to "give complete, truthful and accurate information and testimony, and [not to] commit, or attempt to commit, any further crimes." Notice of Motion ("Not. of Mot."), at Exh. "C," pg. 7. In return, "[i]f the Office determine[d] that the defendant ha[d] cooperated fully, provided substantial assistance to law enforcement authorities, and otherwise complied with the terms of th[e] agreement," *id.*, it would file a § 5K1.1 motion with the sentencing court setting forth the nature and extent of Casso's cooperation. However, the agreement also provided:

> Should it be judged by the Office that ANTHONY CASSO ... has failed to cooperate fully, or has intentionally given false, misleading, or incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this agreement, ANTHONY CASSO will not be released from his plea of guilty but this Office shall be released from its obligation under this agreement ... to file the motion described ... above.

Not. of Mot., at Exh. "C," pg. 8.

In addition, the agreement stated:

> If the defendant requests and in the Office's judgment the request is reasonable, the Office will make application and recommend that the defendant ... be placed in the Witness Security Program, it being understood that the Office has authority

only to recommend, and the final decision to place an applicant in the Witness Security Program rests with the Department of Justice, which will make its decision in accordance with applicable Departmental regulations.

*Id.* at pg. 9. The government did indeed recommend Casso for the Program, and the Department of Justice admitted him.

By letter dated August 8, 1997, Casso's attorney was advised that it was the government's position that Casso had breached the cooperation agreement, and that the government would not submit a § 5K1.1 motion to the Court. Thereafter, on September 5, 1997, the government gave three reasons for its determination: (1) while imprisoned, Casso had assaulted another inmate; (2) Casso had participated in the smuggling of contraband into prison, and had bribed prison officials as part of this scheme; and (3) in an August 1, 1997 letter to the government, Casso had fabricated false information regarding the testimony of two other cooperating witnesses, Alphonso D'Arco ("D'Arco") and Salvatore Gravano ("Gravano"). Casso does not dispute having assaulted another inmate and does not contend that the assault was undertaken in self-defense, although he points out that there was bad blood between the two and that the other inmate had savagely attacked Casso several months earlier. Casso also admits to having bribed prison officials to smuggle contraband into the prison. Casso was transferred to another facility on August 29, 1997, and was removed from the Program on October 9, 1997. This motion ensued.

In support of his claim that the government has acted in bad faith, Casso contends that: (1) his proffer session was unusually brief; (2) the government never allowed him to prove himself as a prosecution witness and would not permit him to testify at a State criminal trial in Kings County; (3) the government has not followed up on leads he provided; (4) agents from the Drug Enforcement Agency have never interviewed him; (5) the Office has repeatedly leaked information from Casso to the press; (6) the Office has warned other cooperating witnesses to stay away from him; (7) a prosecutor stated

in 1995 that he believed that Casso could not be used as a witness; and (8) a former prosecutor, discussing the trial of Vincent Gigante with the *New York Times* several months before Gigante's trial took place, did not mention Casso as a potential witness.

Although, as noted above, Casso admits to having assaulted another inmate and to having bribed prison guards to smuggle contraband into the prison facility, he claims that the government has singled him out for punishment and that other inmates have engaged in similar conduct without having their cooperation agreements terminated. Finally, Casso claims that he is being punished for providing information that calls into question the credibility of Gravano and D'Arco. Casso requests a hearing regarding his allegations of bad faith. He also contends that he is being treated very harshly by prison officials and that, because of risks to his personal safety, he should be reinstated to the Program and moved to a Witness Security Unit.

The government concedes that Casso has given substantial assistance to law enforcement authorities, but argues that Casso's undisputed commission of crimes while in prison and his alleged fabrication of information regarding D'Arco and Gravano constitute breaches of the cooperation agreement that relieve the government from its contractual duty to file a § 5K1.1 motion. The government also contends that the Attorney General acted within her discretion in removing Casso from the Program based upon his commission of other crimes.

## DISCUSSION

### I. General Principles Applicable to the Government's Refusal to File § 5K1.1 Motion

In recent years, the Court of Appeals for the Second Circuit has set forth broad principles regarding the circumstances under which prosecutors may refuse to file a § 5K1.1 motion. As a general rule, "[a]lthough federal prosecutors have considerable discretionary control over whether to move, under § 5K1.1, for a downward departure by reason of cooperation, that discretion is by no

means unlimited." *United States v. Brechner*, 99 F.3d 96, 99 (2d Cir.1996). The Second Circuit has held that a district court may review the government's determination not to file a § 5K1.1 motion "for misconduct, bad faith, or an unconstitutional motive, such as the defendant's race or religion." *United States v. Avellino*, 136 F.3d 249, 260 (2d Cir.1998); see also *Brechner*, 99 F.3d at 99; *United States v. Pollack*, 91 F.3d 331, 335 (2d Cir.1996); *United States v. Rexach*, 896 F.2d 710, 714 (2d Cir.1990); *United States v. Harpaul*, 4 F.Supp.2d 137, 139–40 (E.D.N.Y. 1998). Although "criminal sentencing proceedings are not the same as civil contract disputes," the Second Circuit has routinely applied basic contract principles in construing parties' obligations under cooperation agreements. *U.S. v. Khan*, 920 F.2d 1100, 1105 (2d Cir.1990); *Rexach*, 896 F.2d at 713. Thus, the Second Circuit has made it clear that "there is an implied obligation of good faith and fair dealing in every cooperation agreement, and the reviewing court may properly inquire into whether the government has lived up to its end of the bargain." See *United States v. Fernandez*, 127 F.3d 277, 285–86 (2d Cir.1997); *Brechner*, 99 F.3d at 99; *Rexach*, 896 F.2d at 714. "[A] presumption of fairness underlies agreements between the defendant and the prosecutor, so that when a prosecutor makes a promise and obtains in return cooperation from a defendant, the promise must be kept." *United States v. Khan*, 920 F.2d 1100, 1105 (2d Cir.1992).

In *United States v. Knights*, 968 F.2d 1483 (2d Cir.1992), the Second Circuit identified categories of conduct by a defendant that will *not* excuse the government from filing a § 5K1.1 motion. In *Knights*, the defendant had entered into a cooperation agreement and had testified regarding drug trafficking. The government indicated that it would not be filing a § 5K1.1 motion, giving six reasons for its decision: (1) Knights' cooperation was untimely; (2) he was more culpable than the other defendant against whom he had testified; (3) he had pleaded guilty only because his brother had also pleaded guilty; (4) he had received certain benefits by pleading guilty; (5) the clause in the plea agreement regarding the § 5K1.1 motion had not been

specifically bargained for; and (6) the defendant's trial testimony had been inconsistent with that of his brother.

In vacating the sentence imposed and remanding for further proceedings on the issue of the government's bad faith, the Second Circuit determined that the first four reasons given by the government related to circumstances that preceded the execution of the cooperation agreement. Because of the government's knowledge of those circumstances prior to executing the agreement, "[n]ot only would it be unfair for the government to rely upon such known, pre-agreement circumstances as reason for not moving, it would have been fraudulent to have induced a defendant's plea with a promise that the government already knew it was not going to keep." *Id.* at 1488. The court found the government's fifth reason—that the § 5K1.1 clause had not been bargained for—to be frivolous. As to the sixth reason—that Knights' testimony had been inconsistent with his brother's—the court noted that the government could not walk away from its agreement with the defendant because his testimony contained information that the government did not want to hear, or because the government ultimately lost its case against a co-defendant.

█ The more typical cases are those in which the defendant has in some manner violated the cooperation agreement, either by failing to provide substantial assistance or by committing acts of dishonesty during the term of the agreement. Relying upon language from the Second Restatement of Contracts regarding satisfaction as a condition to performance under a contract, the Second Circuit articulated in *Rexach* the following test in assessing in that case the *bona fides* of the government's dissatisfaction with the defendant's assistance: "where the explicit terms of a cooperation agreement leave the acceptance of the defendant's performance to the judgment of the prosecutor, the prosecutor may reject the defendant's performance

provided he or she is honestly dissatisfied." *See Rexach,* 896 F.2d at 710 (citing Restatement (Second) of Contracts § 228, comment a); *see also Khan,* 920 F.2d at 1105.[2]

Recognizing that the decision whether to file a § 5K.1.1 motion was quintessentially a matter of prosecutorial discretion, the Second Circuit noted in *Rexach* that "[t]he question of 'substantial assistance' is 'self-evidently a question that the prosecution is uniquely fit to resolve.'" *Rexach,* 896 F.2d at 713 (quoting *United States v. Huerta,* 878 F.2d 89, 94 (2d Cir.1989)). The concept of honest dissatisfaction thus appropriately acknowledges prosecutorial discretion, while at the same time providing a template for adjudging the circumstances under which the prosecution will be permitted to renounce its obligation to file a § 5K1.1 motion based upon a failure to provide substantial assistance.

Honest dissatisfaction is a particularly apt analytic standard where the prosecution is contesting the defendant's substantial assistance because a determination as to whether the defendant has not performed satisfactorily under the cooperation agreement in such cases is necessarily both subjective and highly discretionary. However, since *Rexach,* the Second Circuit has also used the concept of honest dissatisfaction as a means of evaluating the government's disavowal of cooperation agreements based upon acts of dishonesty, although such violations are analytically rather different from the failure to render substantial assistance. In contrast to the inquiry into a defendant's substantial assistance, inquiries into dishonesty are more objectively fact-specific, and therefore lend themselves to evaluation in accordance with the basic concept by which a breach of contract is assessed—its materiality. The same can be said, of course, with regard to the commission of crimes.

Thus, subsequent to *Rexach,* the Second Circuit has recognized that acts of dishonesty invariably constitute material breaches of a

2. Restatement (Second) of Contracts § 228 provides in full:

> When it is a condition of an obligor's duty that he be satisfied with respect to the obligee's performance or with respect to something else, and it is practicable to determine whether a

> reasonable person in the position of the obligor would be satisfied, an interpretation is preferred under which the condition occurs if such a reasonable person in the position of the obligor would be satisfied.

cooperation agreement since lying or lack of candor intrinsically undermines a cooperator's credibility and damages the government's case. It has, nonetheless, adhered to the honest dissatisfaction standard articulated in *Rexach*, although acknowledging, either implicitly or explicitly, that the materiality of the breach would obviously serve as an independent basis for nullification of the cooperation agreement. For example, in *United States v. Resto*, 74 F.3d 22 (2d Cir.1996), even though the defendant had concededly provided substantial assistance, the prosecutor alleged, and the court specifically noted, that he had, *inter alia*, lied to prosecutors. While the court viewed this transgression as a breach of the agreement, it cited to *Rexach* and its "honest dissatisfaction" language in determining that the prosecutor had "ample, good faith grounds to decline to move for a downward departure." *Resto*, 74 F.3d at 27.

In *Pollack, supra*, the Second Circuit specifically looked both to the government's honest dissatisfaction and the defendant's material breach. The defendant, an attorney, was arrested in connection with an embezzlement scheme involving his client, a labor union. After he was arrested, he signed a cooperation agreement and provided substantial assistance to the government in connection with its investigation. The government, however, refused to file a § 5K1.1 motion, ostensibly because Pollack had failed to disclose his involvement in an entirely separate crime—the destruction of his house in Florida by arson. Pollack contended, *inter alia*, that he was under no obligation to volunteer information regarding his possible involvement in an unrelated arson investigation, and that the government was acting in bad faith by gaining the benefit of his substantial performance and then seizing upon the existence of the arson investigation as a pretext for excusing its performance under the cooperation agreement. The Second Circuit, however, found that the government had cause to be "honestly dissatisfied" with Pollack's performance based upon its good faith belief that Pollack was involved in the arson and then lied about it. *Id.* at 336. In addition, the court also concluded that, "based upon the language of the cooperation agreement, the government could reasonably conclude

that [the defendant] was in material breach of the agreement when he lied about his involvement in the arson. Accordingly, the government was justified in withholding the § 5K1.1 letter...." *Id.*

Similarly, in *Brechner, supra*, the Second Circuit cited to the "honest dissatisfaction" language of *Pollack*, but its analysis focused upon the defendant's alleged breach and the effect of such breach upon the government's case. As in *Resto* and *Pollack*, the defendant had unquestionably provided substantial assistance. However, during a debriefing session, Brechner initially denied having received kickbacks from two individuals. He quickly changed his story after consulting briefly with counsel in private, confessed that he had in fact received kickbacks, and provided details regarding the payments. Thereafter, the government sought to disavow its obligation to file the § 5K1.1 motion based upon Brechner's purported dishonesty. The district court found that Brechner's cooperation and substantial assistance warranted the motion, despite his false statements during the debriefing session. However, the Second Circuit reversed, finding that although Brechner "swiftly corrected" his misstatements, they nonetheless "seriously undermined [his] credibility as a potential government witness." *Id.*, 99 F.3d at 99. The court held:

As we have previously explained, a cooperating defendant's truthfulness about his own past conduct is highly relevant to the quality of his cooperation. By lying to the prosecutor during the period of his cooperation about his own criminal involvement, Brechner made it impossible for the government to argue at any future trial that, despite his past sins, Brechner had acknowledged his guilt, turned over a new leaf, and cooperated in a truthful and trustworthy manner. The disclosure of Brechner's lies ... would have brought on harsh cross-examination and a powerful argument that Brechner was no more trustworthy as a cooperating witness than he had been as a crook.

*Id.* at 99–100. *See also Fernandez*, 127 F.3d at 286 ("The government's refusal to make a § 5K1.1 motion is justified where the defen-

dant breached his cooperation agreement in a way that damaged the case in which he was cooperating.").

Thus, in cases which involved acts of dishonesty, or which otherwise damaged the prosecutor's case, the Second Circuit has essentially, though not necessarily so articulating, collapsed the overarching concepts of material beach and honest dissatisfaction. In the present case, however, these concepts do not necessarily merge since, as the defendant cogently argues, his admitted current criminal misdeeds pale in comparison to his bone-chilling criminal record and, hence, cannot realistically be deemed to have any material impeachment value or to otherwise have any particular relevance to the government's case. Indeed, while it appears that the Second Circuit has consistently applied the honest dissatisfaction standard whenever the defendant's conduct has arguably damaged the government's case, it has yet to clearly, if at all, invoke this standard in a situation when the breach, such as reflected by the commission of the crimes in the present case, cannot realistically be perceived as materially adversely impacting a defendant's credibility.

## II. Did the government fraudulently induce Casso to enter into the cooperation agreement?

■ Initially, as noted above, Casso claims that the government entered into the cooperation agreement fully intending to breach its obligations thereunder at a later time. As the Second Circuit made clear in *Knights,* the government will not be permitted to renounce its obligation to file a § 5K1.1 motion if it fraudulently induced the defendant to enter into the cooperation agreement, that is to say, if it executed the agreement never intending to comply with its terms. Although "[e]quity will interfere to grant relief where necessary to prevent the consummation of a fraud," *Adams v. Gillig,* 199 N.Y. 314, 322, 92 N.E. 670, 673 (1910), courts "have repeatedly rejected attempts to convert a breach of contract claim into a fraud claim by merely alleging that a contracting party never intended to fulfill its promise under the agreement." *SKR Resources, Inc. v. Players Sports, Inc.,* 938 F.Supp. 235, 238 (S.D.N.Y.1996). Consequently, " 'allegations

of fraud must be supported by the pleading[ ] of specific facts tending to show that, at the time the defendant made the asserted representations and promises, it never intended to honor its stated intentions.' " *Id.* at 238 (quoting *Carlucci v. Owens–Corning Fiberglas Corp.,* 646 F.Supp. 1486, 1491 (E.D.N.Y. 1986)) (other internal citations omitted). "Normally, allegations of mere nonperformance under a contract do not provide strong evidence of fraudulent intent. . . . In such circumstances, fraudulent intent may only be inferred 'when a [party] violates an agreement so maliciously and so soon after it is made that [its] desire to do so before [it] entered into the agreement is evident.' " *Campaniello Imports, Ltd. v. Saporiti Italia, S.p.A.,* 117 F.3d 655, 664 (2d Cir.1997) (quoting *Powers v. British Vita, P.L.C.,* 57 F.3d 176, 185 (2d Cir.1995)); *see also Spier v. Erber,* 1997 WL 26727, at \*10 (S.D.N.Y. Jan.23, 1997).

■ Casso simply has not made a showing that the government did not intend to honor the agreement at its inception—either by demonstrating that the government "maliciously" violated the agreement soon after it was made, or otherwise. As noted above, Casso has made a number of arguments in support of his claim that the government has acted in bad faith. He argues at length that the government did not adequately exploit him as a possible witness; however, the government freely concedes that Casso has provided substantial assistance to its organized crime investigations. His remaining arguments fare no better. His assumption that the United States Attorney's Office must have been the source of certain leaks to the press is completely speculative, and, in any event, of no material significance. The fact that a former Assistant United States Attorney suggested to the press that Casso would not be called as a witness in the trial of Vincent Gigante is of absolutely no probative value. Finally, the Court is unable to discern why warnings given by certain Assistant United States Attorneys to other inmates to stay away from Casso are even remotely relevant to a determination as to whether the government intended to breach the cooperation agreement. In sum, Casso's arguments

are at best ambiguous and "are insufficient to raise a strong inference of fraudulent intent." *Campaniello Imports*, 117 F.3d at 664. Having concluded that Casso has not made a sufficient showing that the agreement was fraudulently induced, the Court consequently determines that the agreement is valid and enforceable. *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir.1997).

### III. Does Casso's commission of crimes justify the government's honest dissatisfaction?

Casso, in effect, argues that materiality is an essential benchmark for measuring his entitlement to specific performance. Although Casso admits to having assaulted another inmate while in prison and to having smuggled contraband into the facility, he contends that these conceded crimes do not constitute material breaches of the cooperation agreement. In support of this argument, he points out that others who have committed comparable or even more serious crimes have not been treated as harshly as he. Moreover, Casso appears to argue that, because of his violent background, the incremental effect of his prison crimes upon his credibility is minimal, and hence cannot, in good faith, be relied upon by the government as a basis for its decision not to file the § 5K1.1 motion.

The Court agrees that the new crimes, when considered together with the 15 murders to which Casso has confessed, are not realistically likely to have an impact upon his credibility, nor, as in *Brechner*, do they necessarily reflect upon his dishonesty. The Court nonetheless determines that, even if the government never intended to have Casso testify as a witness, as Casso maintains, his commission of serious crimes during the period of his cooperation must be viewed as an adequate predicate for the government's honest dissatisfaction. The Court observes that the clear language of the cooperation agreement conditions the government's obligation to file the § 5K1.1 letter not only upon its determination that Casso has provided substantial assistance, but also upon its determination that Casso has provided truthful information and has refrained from further criminal behavior during the term of the agreement. *See* Not. of Mot. at pp. 7–8. The Court concludes that, even if the potential impeachment value of additional crimes is *de minimis*, the government should nonetheless be permitted, within the confines of the honest dissatisfaction standard, to evince its lack of tolerance for subsequent criminal conduct by a cooperating witness.

The government should not be required to turn a blind eye to criminal conduct by cooperating witnesses merely because such conduct, when considered in connection with past misdeeds, may not materially alter the jury's view of such a witness, or because other criminals may have engaged in similar conduct. Simply put, criminal behavior by cooperators should be condemned, not condoned, and repudiation of the government's obligations under a cooperation agreement is an effective means of delivering such an important message. Moreover, the strict materiality standard urged by Casso would, as a practical matter, lead to perverse and counterintuitive results, since the more egregious a defendant's criminal history, the less likely it is that the commission of crimes during the term of a cooperation agreement will have an ascertainable impact upon the defendant's credibility. In sum, Casso's commission of other crimes during his incarceration gave the government a good faith basis for its honest dissatisfaction with his performance.

Casso also argues that the government should be estopped from declining to make the § 5K1.1 motion. However, it is well established that "[e]stoppel is an equitable remedy which requires that the party invoking such must do so with clean hands." *Rodgard Corp. v. Miner Enterprises, Inc.*, 914 F.Supp. 907, 928 (W.D.N.Y.1995), *aff'd in part, vacated in part on other grounds*, 108 F.3d 1394 (Fed.Cir.1997); *see also Stone v. Williams*, 891 F.2d 401, 404 (2d Cir.1989) (quoting *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866, 874 (E.D.N.Y. 1978) ("[O]ne who seeks Equity's assistance must stand before the court with clean hands.")). As Casso's hands are decidedly unclean, he is not entitled to invoke the equitable doctrine of estoppel. Accordingly,

the government is not required to apply to the Court for a downward departure pursuant to § 5K1.1.

## IV. Are there additional grounds that would justify the government's honest dissatisfaction?

As also noted above, the government also argues that Casso's alleged fabrication of information about D'Arco and Gravano in Casso's August 1, 1997 letter serves as an additional basis for its refusal to file a § 5K1.1 motion. Although the Court has determined that the commission of other crimes serves as an adequate, independent predicate for the government's decision not to file the motion, the Court notes that Casso has since retracted one of the statements contained in the letter—that Gravano told him that he had ordered the stabbing of the Reverend Al Sharpton. Moreover, Casso's statements regarding Gravano's involvement in narcotics trafficking are completely inconsistent, and his explanation for this inconsistency—his alleged belief that the government did not want to hear what he had to say—is wholly self-serving. In light of the Second Circuit's reversal in *Brechner*, these admitted inconsistencies in Casso's statements, which have an adverse impact upon his overall credibility, are further justification for the government's refusal to file the § 5K1.1 motion.

## V. Is Casso entitled to a hearing?

■ Casso has requested a hearing in respect to his allegations of bad faith. However, a hearing need not be granted "unless the district court has sufficient information to place the issue of the prosecutor's good faith reasonably in dispute." *Khan*, 920 F.2d at 1102. The Second Circuit has explained a defendant's burden as follows:

Defendant must first allege that he or she believes the government is acting in bad faith. Such an allegation is necessary to require the prosecutor to explain briefly the government's reasons for refusing to make a downward motion. Inasmuch as a defendant will generally have no knowledge of the prosecutor's reasons, at this first or pleading step the defendant should

have no burden to make any showing of prosecutorial bad faith. Following the government's explanation, the second step imposes on defendant the requirement of making a showing of bad faith sufficient to trigger some form of hearing on that issue. *Id.* at 1106. Therefore, "[u]nless the government's reasons are wholly insufficient, or unless the defendant's version of events, supported by at least some evidence, contradicts the government's explanation, no hearing is required." *United States v. Imtiaz*, 81 F.3d 262, 264 (2d Cir.1996). Since the facts upon which the Court has relied in determining that the government could be honestly dissatisfied with the defendant's performance are undisputed, and since Casso's allegations of fraud in the inducement are skeletal and insubstantial, there is no need for a bad faith hearing.

## VI. Casso's Removal from the Program

Casso also seeks an order returning him to the Program. The government maintains that the Attorney General acted within her discretion in removing Casso from the Program. However, it is uncontested that Casso has not sought to challenge his removal from the Program administratively, claiming, in a conclusory fashion, that such a challenge would be futile. By letter dated March 3, 1998, the government advised Casso that the Office of Enforcement Operations of the Bureau of Prisons would entertain a grievance challenging his removal from the Program, provided such challenge was filed within 15 days. By letter to the government dated March 6, 1998, counsel for Casso stated that a challenge would be futile and that the Court should properly decide the issue.

■ It is well established that "'a party may not seek federal judicial review of an adverse administrative determination until the party has first sought all possible relief within the agency itself.'" *Able v. United States of America*, 88 F.3d 1280, 1288 (2d Cir.1996) (quoting *Howell v. Immigration and Naturalization Serv.*, 72 F.3d 288, 291 (2d Cir.1995)) (other internal quotations omitted); *see also Pavano v. Shalala*, 95 F.3d 147, 150 (2d Cir.1996). However, exhaustion of administrative remedies may be excused if administrative appeal would be

futile. *See Pavano,* 95 F.3d at 150; *Able,* 88 F.3d at 1288. Casso argues that, under the circumstances here, exhaustion would "obviously be futile," Memorandum of Law, at pg. 33 n. 5, but sets forth no basis for this assumption. Nor does it necessarily follow that the Bureau of Prisons would refuse to entertain a grievance filed at this late date where, as here, the defendant has taken prompt action to challenge the Bureau's determination in the judicial forum. Although Casso seeks to cast his argument that he should be returned to the Program as implicating his constitutional right to effective assistance of counsel, the argument is in fact an administrative matter that should first be considered by the Attorney General or her designee pursuant to 18 U.S.C. § 3521(d)(1). "Parties are generally required to exhaust their administrative remedies, in part because of concerns for separation of powers (*i.e.,* the need to limit judicial interference in the agency process) . . . ." *Pavano,* 95 F.3d at 150. Accordingly, Casso's request for an order moving him into a Witness Security Unit is denied pending administrative review of his claim that he was improperly removed from the Program.

## CONCLUSION

For the foregoing reasons, Casso's motion is denied in its entirety.

**SO ORDERED.**